UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

Terrel Gregory, *et al.*,

                    Plaintiffs

        v.

Rebecca Palmer, *et al.*,

                    Defendants

Case No. 2:20-cv-01439-CDS-EJY

**Order Granting Defendants' Motion for Summary Judgment and Denying Plaintiffs' Motion for Partial Summary Judgment**

[ECF Nos. 28, 29]

Plaintiff Terrel Gregory brings this civil-rights action on behalf of himself and as special administrator for the estate of his mother, Eila Rose Ukaoma-Gregory, under 42 U.S.C. § 1983 against the city of North Las Vegas and four of its police officers.[1] The plaintiffs claim that they were wrongfully handcuffed, detained, and falsely arrested. Terrel also alleges that he sustained physical injuries during his arrest and was subject to excessive force. The plaintiffs claim that the defendants violated their rights protected by the First, Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution, and they bring several similar state law claims as well.

The defendants move for summary judgment on all claims. ECF No. 29. For the reasons asserted herein, I grant summary judgment on both of the federal claims and decline to exercise supplemental jurisdiction over the remaining state law claims. Because I grant summary judgment in the defendants' favor, I deny as moot the plaintiffs' motion for partial summary judgment on the affirmative defenses. ECF No. 28.

**I.    Background information**

   *A.   Police encountered the plaintiffs at a residence on Gallowtree Street in North Las Vegas.*

North Las Vegas Police Department (NLVPD) Officers Conchas, Montgomery, and Palmer responded to two anonymous 911 calls associated with address 3740 Gallowtree Street in

---

[1] For clarity, I refer to the plaintiffs by their first names (Terrel and Eila) throughout this order.

North Las Vegas, Nevada, on November 16, 2019. *See* 911 Calls, ECF Nos. 29-2 (manually filed); 29-3 (same). The first 911 call was placed by a female who asked for police assistance because her ex-boyfriend refused to leave her home. ECF No. 29-2. During the second 911 call, dispatchers were given the same Gallowtree address by a female caller with no further information. ECF No. 29-3. On both calls, the caller spoke quietly—indeed, the dispatcher repeatedly indicated that she could not hear the caller—and was largely non-responsive when the dispatcher asked for further information.

When the three NLVPD officers arrived at the Gallowtree residence, they attempted to contact the people inside by knocking on the front door, ringing the doorbell, and announcing their presence several times. Palmer Body-Worn Camera (BWC), Ex. D-1, ECF No. 29-4 at 00:02–00:21.[2] When the door opened, the officers explained that they were responding to two 911 calls from this address; a woman inside the house stated that the call "must've been a mistake" and that the officers were being "aggressive." *Id.* at 00:24–00:40. The woman, later identified as Eila, attempted to close the front door, but Officer Palmer wedged her foot in the door, preventing Eila from closing it. *Id.* at 00:40–00:50. Palmer's foot remained wedged in the door for the entirety of the conversation, even after Eila tried closing it, until the officers eventually walked away. Officer Concha explained that due to the nature of the 911 calls, the officers needed to ensure the safety of everyone inside the house. *Id.* at 00:47–00:53. A second female occupant standing on the inside stairs, later identified as Tierra Gregory,[3] yelled that everyone in the house was already by the front door and that everyone was okay. *Id.* at 00:52–00:58. A third occupant, later identified as Terrel, peeked out from behind the door as well. *Id.* The officers and inhabitants began to argue, as Eila explained that she "felt threatened" because

---

[2] Both parties rely on the body camera footage in their motions for and oppositions to summary judgment. Because the footage is not in dispute, I accept it as accurately depicting what occurred on November 16, 2019. *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (courts "should [] view[] the facts in the light depicted by the videotape").

[3] Tierra Gregory is not a party to this action. The information about her actions on the date in question and subsequent arrest are provided to explain the full picture of the events that gave rise to this case.

of the way the officers were standing outside of her doorway with a foot in her "fucking door." *Id.* at 01:00–01:42. Eila told Palmer to move her foot. *Id.* at 1:10–1:20. At the same time, Tierra stated that she was going to call the police. *Id.* A male officer responded that doing so would result in her being sent to jail, and Palmer explained that calling 911 without an emergency to report would be misuse of 911. *Id.* The officers again attempted to explain their purpose in investigating the 911 calls while Tierra and Eila became increasingly agitated with the encounter. *Id.* at 01:25–01:35. An officer asked them to stop screaming, to which Tierra screamed in response, "suck my dick, that's what you can do, bitch." *Id.* Eila informed the officers that she would never call the police because she "doesn't trust you motherfuckers." *Id.* at 01:45–01:52. The officers told Eila again that an "uncooperative female" had called the police—they indicated that that "matches [Eila] perfectly"—and that they were there to investigate and ensure everyone's safety. *Id.* at 01:41–02:04. The parties reiterated their positions over the next minute, before one of the officers explained that he did not know if, for example, someone was behind Eila threatening her. *Id.* at 02:35–02:46. Eila swung her door open, displaying the interior of her home, and she said, "no one's here." *Id.* at 02:45–02:51. She then opined that the officers were only there because she is African American and yelled out the door, "Hello, neighbors! Do y'all see the cops out here harassing me?" *Id.* at 02:50–03:05. An officer told Eila that if she yelled one more time, she would go to jail for public nuisance. *Id.* at 03:04–03:07. After another brief exchange, an officer asked if anyone else was in the home. *Id.* at 03:21–03:29. Eila responded that there was not, and a male (presumably Terrel) confirmed that nobody else was present and that everyone was okay. *Id.* The officers responded, "ok, have a good day" and left the doorway to return to their vehicles. *Id.* at 03:25–03:55.

        B.   *Officer Palmer ran a records-check on Eila's car, and Tierra was arrested.*

        When Officer Palmer returned to her squad car, she ran a records check on a Chevrolet Impala that was parked on the street close to the Gallowtree house. Palmer Dep., ECF No. 29-7

at 35.[4] The check revealed that the license plate was suspended. *Id.* Officer Palmer prepared a

citation for the suspended plate. Montgomery Arrest Report, ECF No. 29-8 at 2. As she was

doing so, Tierra exited the Gallowtree residence, got into a Toyota Camry that was parked in

the driveway of that home, backed it up, and drove it into the middle of one side of the street. *Id.*

at 2–3. Tierra then exited the Camry but left it running while parked in the middle of the road.

*Id.* As a result, defendant Montgomery initiated a traffic stop on the Camry with his patrol car

behind it. *Id.* at 3. He activated his car's emergency lights and sirens and ordered her to the front

of his car. *Id.*  She did not comply; she instead returned to the Camry and drove it into the

driveway of the house. *Id.* She then began to walk back towards the entrance of the house. *Id.*

Montgomery then arrested her for obstruction. *Id.* Tierra resisted arrest and began to yell at

Montgomery. *Id.* Other people—including Terrel and Eila—heard the commotion and began to

exit the house.[5] *Id.* Montgomery warned Terrel not to interfere with what was going on or he

would go to jail. *Id.*

  *C.   Eila and Terrel were arrested for interfering with Tierra's arrest.*

  As Palmer continued to cite the Chevrolet Impala, Terrel exited the residence and

approached her. No. 29-7 at 37. Both Palmer and Conchas commanded Terrel to stay in his

driveway so Palmer could finish what she was doing. *Id.* Terrel did not comply; he continued

forward, yelled at the officers and Eila, and then entered the house through the garage.

Montgomery Dep., ECF No. 29-9 at 34–35. Montgomery testified that he was concerned as to

why Terrel walked back and forth between the scene and his house. *Id.* at 36. Montgomery

stated that he "knew this could create a bad situation . . . based on [his] experience in the past

---

[4] While my other citations reference the page numbers assigned by the court's docketing system, CM/ECF, at the top of each page, my citations to deposition testimony reference the deposition transcript pagination (*i.e.*, ECF No. 29-7 at 35 refers to deposition page 35).

[5] Palmer also testified that additional people came out of the residence. ECF No. 29-7 at 35–36. She does not identify how many more but notes that there were "more than the three people that we were told were in there, so that was kind of unexpected." *Id.* At least one additional person is visible on video in the garage of the home while Terrel was being arrested. Montgomery BWC, Ex. E-2, ECF No. 29-5 at 14:14.

and the fact that [the officers] [still] didn't know how many people were in that house." *Id.* While this was going on, Eila was yelling at Terrel to calm down and shut up. *Id.* at 34.

Tierra, by now under arrest in the back of an NLVPD squad car, initially refused to answer the officers' questions or responded dismissively (*i.e.*, "suck my dick" in response to "what's your last name?"). Montgomery BWC, Ex. E-2, ECF No. 29-5 at 05:15–05:30. Montgomery informed Terrel that Tierra was going to jail for obstruction and returned to talk to Tierra. *Id.* at 05:30–05:55. Eventually, Tierra told Montgomery that she was the one who originally called 911 after her boyfriend hit her. *Id.* at 10:30–12:20.

Eila was also taken into custody and placed into the back of Palmer's vehicle. ECF No. 29-7 at 36. Meanwhile, Terrel continued to go in and out of the home while vocally interfering with the officers' arrests of Eila and Tierra. Conchas Dep., ECF No. 29-10 at 56–57. During one of the times Terrel went back into the home, Conchas followed him into the garage and directed him to "come outside." *Id.* at 61–62. Terrel then reentered the home and Conchas lost sight of him, but he eventually reappeared holding a cell phone. *Id.* at 62. Terrel returned to the driveway to film Eila's arrest, when he was then arrested by Montgomery and Conchas. *Id.* at 62–64. Terrel was arrested for ignoring officer commands and going into and out of the residence after being told to stay outside the home and to stop interfering with the officers' efforts.[6] ECF Nos. 29-9 at 35–38; 29-10 at 66–68. He was also warned that he would be arrested. ECF No. 29-9 at 35. Palmer further testified that as they were attempting to arrest Terrel, another female was in the garage yelling, "just let them" and "just stop resisting." ECF No. 29-7 at 38. Montgomery testified that it appeared that Terrel was going to grab his legs and that Terrel struggled throughout his arrest. ECF No. 29-9 at 42. Conchas testified that Terrel was "squirming around inside his sweater" and that he could not get ahold of him. ECF No. 29-10 at 65–66.

---

[6] BWC footage shows Montgomery telling Terrel to stay out of the way as he was arresting Tierra, and other officers directed Terrel to either stay in or out of the home several times. Palmer BWC, Ex. E-2, ECF No. 29-5 at 07:19–07:30. He did not comply with the commands. Montgomery BWC, Ex. D-2, ECF No. 29-4 at 04:30–04:50 (Conchas directed Terrel to go into the house while Terrel was asking for the officers' badge numbers and Palmer was directing Terrel to go inside the house or else he would be arrested for obstructing); *id.* at 12:40–13:45 (arrest of Terrel).

1    Eila was formally charged with a public nuisance offense and two counts of false

2   statement to/obstructing an officer. Eila Arrest Report, ECF No. 29-1 at 1. Terrel was charged

3   with one count of false statement to/obstructing public officer, one count of maintain/permit

4   nuisance,[7] and one count of resisting a public officer. Terrel Arrest Report, ECF No. 29-8 at 1.

5    *D.   Defendants' expert Ken Kataris opined that the officers acted appropriately.*

6    Ken Kataris, a retired sheriff and certified Florida Law Enforcement Officer and

7   instructor, issued an expert opinion on how the officers handled the arrests of Eila and Terrel.

8   ECF No. 29-11. Kataris opined that the arrests of Terrel and Eila Gregory were "consistent with

9   recognized, accepted[,] and trained police practices." *Id.* at 11. He further opined that given the

10   totality of the circumstances, the officers responded to the 911 calls appropriately and that

11   nothing in the defendants' response to the situation indicated that race played a role in the

12   investigation and/or subsequent arrests. *Id.* at 12. He added that the officers' BWC demonstrates

13   that Terrel was making threats and swinging his arms in an attempt to strike the officers. *Id.* at

14   15. He concluded that the officers acted in accordance with police practices as adopted by the

15   NLVPD. *Id.* at 16.

16    *E.   Plaintiffs' expert Tommy J. Burns opined that the officers lacked a reason to detain and arrest the*

17    *plaintiffs.*

18    Tommy J. Burns, a former chief of police who now works as a private investigator and

19   consultant, also issued an expert opinion on the arrests. ECF Nos. 37-20 (report); 37-21

20   (supplemental report); 37-22 (deposition). Burns opined that the detention, arrest, searches, and

21   bookings of Eila and Terrel were not consistent with standard police practices. ECF No. 37-20 at

22   3–6. He further opined that the officers did not have probable cause or reasonable suspicion to

23   detain the plaintiffs. *Id.* at 3. Burns' reports concludes that the plaintiffs did not commit any

24   crimes and that neither plaintiff did anything suspicious, much less criminal. *Id.* at 4–5. Burns

25

26

---

[7] This appears to be the same as a public nuisance offense.

also opined that "contempt of cop" occurred, which, per his report, is a colloquial term for abusive arrests. *Id.* at 6.

F. *Summary of the plaintiffs' claims*

About a year and a half after the arrests, Eila passed away from seemingly unrelated causes. Am. Compl., ECF No. 26 at 2. Terrel brings claims both on his behalf as well as on behalf of Eila, as administrator of her estate. *Id.* The plaintiffs assert First, Fourth,[8] Fifth, and Fourteenth Amendment violations against the four officers under § 1983, state law battery against the four officers, respondeat superior against the City of North Las Vegas, and negligent hiring, training, and supervision against the city. *Id.* at 6–10. The defendants move for summary judgment on each claim against them, and the plaintiffs cross-move for summary judgment on the defendants' affirmative defenses. Only the defendants' motion has been fully briefed; the plaintiffs failed to file a reply brief in support of their motion.

## II.   Legal standard

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). At the summary-judgment stage, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed; the case must then proceed to the trier of fact. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Once the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts

---

[8] The court notes that the plaintiffs limited their claim for relief on the Fourth Amendment to alleging excessive force, and could have, but did not, bring a claim for relief based on unlawful search and seizure based on the protections provided by the Fourth Amendment.

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323. "To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial." *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018).

**III.    Discussion**

Defendants contend they are entitled to summary judgment because (1) plaintiffs fail to demonstrate a constitutional violation; (2) the officers are entitled to qualified immunity; (3) Defendant Cesena was not directly involved in any of the activities that give rise to the causes of action; (4) the City of North Las Vegas cannot be held liable under a respondeat superior theory of liability; and (5) the plaintiffs fail to establish a genuine dispute of material fact as to the claim for negligent hiring, training, or supervision.

a.    *Cesena is granted summary judgment on all of the plaintiffs' claims against him.*

Cesena moves for summary judgment, arguing that the plaintiffs have failed to produce evidence that he was involved in any of the actions giving rise to this suit. ECF No. 29 at 12. The plaintiffs respond that Cesena transported Eila from the scene to the booking facility after her arrest. ECF No. 37 at 9. But this argument does not address the substance of the defendants' argument; namely, that the plaintiffs have not presented evidence that Cesena personally participated in any deprivation of their constitutional rights. The only evidence that the plaintiffs can identify in support of their claims against Cesena is that "the produced police report" indicates that he transported Eila from the scene. *Id.* They do not identify any evidence probative of whether Cesena caused an injury to Eila or whether he violated any of her constitutional rights. The plaintiff bears the burden in a § 1983 action of demonstrating that each defendant "is a participant in the incidents that could give rise to liability[.]" *Paine v. City of Lompoc*, 265 f.3d 975, 984 (9th Cir. 2001). And the plaintiffs, with the benefit of full discovery, have failed to identify any evidence demonstrating that Cesena participated in any deprivation

of Eila's constitutional rights. I thus grant Cesena summary judgment on each of the plaintiffs' claims against him.

> b. *The remaining officer defendants are entitled to qualified immunity.*

"In § 1983 actions, qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sampson v. Cnty. of Los Angeles*, 974 F.3d 1012, 1018 (9th Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). A court conducts a two-step inquiry to determine whether an officer is entitled to qualified immunity. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1020 (9th Cir. 2009). The court may address these steps in any order. *Felarca v. Birgeneau*, 891 F.3d 809, 815–16 (9th Cir. 2018). While case law "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (cleaned up). In other words, "immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). Such immunity "is effectively lost if a case is erroneously permitted to go to trial." *Pearson*, 555 U.S. at 231. The United States Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015) (quotation marks omitted). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers **are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue.**" *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting *Mullenix*, 577 U.S. at 13) (emphasis added).

The plaintiffs allege that the defendants violated their rights under the First, Fourth, and Fourteenth Amendments.[9] I address each alleged constitutional violation individually and find

---

[9] They also allege that the defendants violated their Fifth Amendment rights, which I address *infra* in subsection *C*.

that the officers are entitled to qualified immunity for each claim.

              *1.   The officer defendants did not violate any clearly established First Amendment right.*

      The First Amendment forbids government officials from retaliating against individuals for speaking out. *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010). To state a claim for First Amendment retaliation against a government official, a plaintiff must demonstrate that "(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Mulligan v. Nichols*, 835 F.3d 983, 988 (9th Cir. 2016). Further, a plaintiff bringing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019). There is an exception to the probable cause requirement when "officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 1727. That exception applies only "when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* Showing "differential treatment addresses [the] causal concern by helping to establish that non-retaliatory grounds [we]re in fact insufficient to provoke the adverse consequences." *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1056 (9th Cir. 2019) (quoting *Nieves*, 139 S. Ct. at 1727).

      There is no genuine dispute that the officer defendants had probable cause to arrest Elia under Nevada's public nuisance statute. Every act which "[a]nnoys, injures[,] or endangers the safety, health, comfort, or repose of any considerable number of persons" or "[o]ffends public decency" "is a public nuisance." NRS § 202.450(3). Palmer intended to cite the Chevrolet Impala outside of the plaintiffs' home for having a suspended license plate, but the plaintiffs exited their house to interfere with her doing so. ECF No. 29-1 at 1–2. Per the police report,[10] Eila drove a

---

[10] In reviewing the body camera footage, it is unclear whether Tierra or Eila initially drove the car and parked it on the street blocking the roadway. But that fact is immaterial because it was the act of

separate car onto the street and "parked across the street blocking the entire roadway[.]" *Id.* This led to a confrontation resulting in Tierra's arrest. *Id.* As Tierra was being arrested, Eila "started yelling and screaming." *Id.* Because she had already been warned to stop screaming in close proximity to the other neighbors, Palmer determined that Eila committed the offense of public nuisance and arrested her. *Id.* Montgomery noted that "several neighbors were outside in the immediate area" and concluded that they were likely disturbed by the screaming and commotion. ECF No. 29-8 at 2. Police in Nevada have probable cause to effectuate an arrest when they "have reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution to believe that [a crime] has been . . . committed by the person to be arrested." *State v. McKellips*, 49 P.3d 655, 660 (Nev. 2002). The arresting officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). Under this law, there is no genuine dispute that Palmer had probable cause to arrest Eila for public nuisance. Her parking of the car diagonally across the street, preventing others from travelling down that road, and loudly screaming in the middle of a residential neighborhood could reasonably annoy or endanger the health or comfort of other neighborhood residents.

Terrel was arrested both for public nuisance and for obstructing a police officer. The evidence does not support Terrel's arrest for public nuisance. The video footage shows Terrel exercising his First Amendment rights in expressing criticism of the officers and their actions. "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Houston v. Hill*, 482 U.S. 451, 461 (1987). In fact, the freedom of individuals to oppose or challenge police action verbally without thereby risking arrest is one important characteristic by which we distinguish ourselves from a police state. *Id.* at 462–63. And while

---

reentering the car and driving it back into the driveway, in contravention of police commands, that ultimately led to the confrontation that resulted in Tierra's arrest.

Terrel's vocal objections and demands were loud, and at times offensive and disrespectful to the officers, it doesn't make the conduct unlawful.

The officers did have sufficient evidence to arrest Terrel for obstruction. "Every person who . . . willfully hinder[s], delay[s ,] or obstruct[s] any public officer in the discharge of official powers or duties" shall be guilty of the misdemeanor of obstruction. NRS § 197.190. Montgomery states that he arrested Terrel for the same yelling behavior, in addition to interfering with the arrest of Tierra. ECF No. 29-8 at 2. The video is clear that Terrel was, indeed, repeatedly disregarding the officers' orders to stop interfering, prior to the officers arresting him. Montgomery BWC, Ex. E-2 at 13:15–13:40. He continued to move in and out of the home while officers were attempting to effectuate two arrests; arrests that were taking place while the officers were balancing additional persons coming in and out of the Gallowtree house[11] and neighboring homes. Terrel's refusal to follow the officers' directives hindered and/or delayed their ability to perform their duties. Based on the BWC footage, the officers had sufficient probable cause to arrest Terrel for obstruction.

The plaintiffs' counterarguments rely on conjecture as to the motives of the police officers. They proffer no evidence suggesting that the officers' actions were a pretext for discriminatory intent. Rather, the evidence shows that the officers did not arrest either plaintiff when they expressed distrust with the police or their opinion that they were being targeted based on their race. The video footage also shows that the officers left the front door of the Gregory home after explaining why they were there and why they felt they had needed to conduct further investigation; they also engaged in an argument with the plaintiffs for several minutes. It was not until the officers walked away and Palmer attempted to cite a car with a

---

[11] The court notes that—contrary to the plaintiffs' representations to the officers at the door—there were more than three people in the residence. The officers had reason to be on heightened alert about the misrepresentations made to them by the plaintiffs and whether anything, or anyone, inside the house could pose a threat to them.

suspended license plate that the plaintiffs exited their home to continue yelling at the officers and refused to heed numerous commands from the officers.

Because there is no genuine dispute that the officers had probable cause to arrest Eila and Terrel,[12] the plaintiffs are required to demonstrate that similarly situated individuals are treated differently. *Nieves*, 139 S. Ct. at 1727. This exception applies only if a plaintiff "presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id*; *see also Ballentine v. Tucker*, 28 F.4th 54, 62 (9th Cir. 2022). As discussed, there is evidence showing that the officers had probable cause to arrest both Eila and Terrel. The plaintiffs fail to point to any evidence, objective or otherwise, triggering the narrow *Nieves* exception. Consequently, the plaintiffs' claim for retaliatory arrest fails as a matter of law. As a result, I grant the officer defendants summary judgment on the First Amendment claim.

> 2. *The officer defendants did not violate any clearly established Fourth Amendment right.*

The Fourth Amendment precludes law enforcement from employing excessive force to arrest a suspect. *Graham v. Connor*, 490 U.S. 386, 388 (1989). In a claim for excessive force under the Fourth Amendment, the inquiry is whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them. *Id.* at 397; *Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241 (2021) (per curiam) (holding that reasonableness is the lodestar under which the Court should analyze excessive force claims). This standard requires an evaluation of the officer's conduct "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citation omitted). To assess the "reasonableness" of a law enforcement officer's conduct, courts first consider the "nature and quality of the alleged intrusion," then turn to the governmental interests at stake: "(1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3)

---

[12] *See United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) ("[I]f the facts support probable cause to arrest for one offense, the arrest is lawful even if the officer invoked, as the basis for the arrest, a different offense as to which probable cause was lacking.").

whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)). This is not an exhaustive list, but rather I am to consider the totality of the circumstances and consider whatever factors may be appropriate in a particular case. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). Courts also consider a plaintiff's interests by looking to the "type and amount of force inflicted" and "the severity of injuries" experienced by the plaintiff. *Felarca*, 891 F.3d at 817.

The plaintiffs fail to explain how Eila was injured or how Palmer used excessive force against her.[13] Instead, they argue that Palmer was vaguely informed of Eila's unidentified pre-existing medical condition during her arrest. While the crimes Eila was alleged to have committed were minor, the officers were simultaneously faced with numerous individuals interrupting their duties and failing to comply with their commands. Palmer's decision to arrest and handcuff Eila was reasonable in light of the totality of the circumstances. And while excessively tight handcuffing may constitute excessive force, the plaintiffs have not provided any evidence demonstrating that Eila was, in fact, tightly handcuffed or injured by the handcuffing. They do not cite to any medical evidence or testimony from Eila throughout their response brief. ECF No. 37 at 16–17. I thus grant the officer defendants summary judgment on any excessive-force claim based on their arrest of Eila.

Terrel's claim fares differently, however, because he specifically alleges that he was violently thrown to the ground and struck in the head twice. ECF No. 37 at 17. The body camera footage of Terrel's arrest clearly shows a scuffle between him and the officers, including Montgomery's use of a great deal of force in subduing him. Montgomery BWC, Ex. E-2 at 13:25–14:30. I must consider the totality of the circumstances and the relevant factors of the crimes

---

[13] The plaintiffs' response brief states only that she was "injured" and that the officer laughed and scoffed at her injury. ECF No. 37 at 16. But the court is left to speculate as to what injury, if any, she suffered. Such speculation does not amount to a genuine dispute of material fact. *Barrera v. Costco Wholesale Corp.*, No. 21-56251, at *4 (9th Cir. Aug. 17, 2022) ("[S]peculation alone cannot defeat a motion for summary judgment.").

Terrel allegedly committed (obstruction and public nuisance), along with whether he posed an immediate threat to the safety of the officers or others given the circumstances, and whether he was resisting and/or evading arrest. *Graham*, 490 U.S. at 396. The "most important" *Graham* factor is whether the suspect posed an "immediate threat to the safety of the officers or others." *Mattos*, 661 F.3d at 441 (quoting *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005)). I must keep in mind "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 442 (citing *Graham*, 490 U.S. at 396–97).

The doctrine of qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix*, 577 U.S. at 11 (quoting *Pearson*, 555 U.S. at 231). "Clearly established" means that the statutory or constitutional question was "beyond debate," such that every reasonable official would understand that what he is doing is unlawful. *See District of Columbia v. Wesby* 583 U.S. 48, 62 (2018); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1035 (9th Cir. 2018). Relevant case law "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up). In other words, "immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Mullenix*, 577 U.S. at 12). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (2018) (per curiam) (quoting *Mullenix*, 577 U.S. at 13).

In opposition to the motion for summary judgment on this claim, Terrel argues there is no objective factor in support of the amount of forced used against him. He cites to Montgomery's deposition testimony, where Montgomery stated that he was justified in performing a knee strike to Terrel's head because Las Vegas is the mixed martial arts (MMA)

1   capital of the world. *See* ECF No. 37 at 17. But that takes the testimony out of context.

2   Montgomery actually testified that there are a lot of MMA studios in Las Vegas, stating:

> "[W]e're always on the lookout for someone that knows way more than [the officers]. And that's why even three officers in that situation, that doesn't even matter. We can always use more in a situation where someone is fighting with us. So not knowing what he knows, wrestling, whatever, I deliver a quick knee strike to his head area right in front of me. And it has no effect. I give him a quick strike with my right hand, knocks him back, and—I don't know—somewhere in the head. He was moving a lot, at which point, Officer Conchas and I were able to take him to the ground where he continued to fight with us, struggle, saying all sorts of things. [I don't know] exactly what he was saying. I'd have to look at the camera. At one point, it—because he continued to fight, and he just was not listening to any of our commands—I pulled out my Taser. I didn't really have a good shot at him, and we were kind of close. The only thing I could do was drive stun him, at which time Palmer said, 'You're going to get tased. You're going to get tased.' And he said, 'Okay, okay, okay. I'll stop.'"

11   Montgomery Depo., Plf. Ex. 6, 37-6 at 42–43. Terrel argues that he was merely videotaping what

12   was going on as a 19-year-old man, weighing approximately 130 pounds, thus there was no need

13   for multiple officers to arrest him. ECF No. 37 at 17–18. He argues that he did not pose a danger

14   to anyone and the officers grabbing him, throwing him to the ground, and striking his head was

15   excessive, especially given together the officers significantly outweighed him. *Id.*

16       This case typifies the difficult decision-making by officers in an uncertain and rapidly

17   evolving situation. In viewing the evidence in the light most favorable to Terrel, it shows that he

18   was arrested by three officers for non-violent, non-felony offenses. The officers had responded to

19   two 911 calls, neither of which indicated that anyone had any weapons or that there was some

20   sort of ongoing violence. And, at the time he was arrested, there was no indication that he posed

21   a serious threat to the officers or to anyone else. When the officers attempted to arrest him, he

22   was taken to the ground, and then briefly pinned down. But the evidence shows that he was

23   taken to the ground because he was struggling with the officers, bucking his body so that the

24   officers had to use physical force to handcuff him. This physical struggle occurred after the

25   officers had repeatedly warned and instructed Terrel to stop going in (or out of) the house so

26   they could finish arresting Eila and Tierra—commands he failed to heed.

To defeat qualified immunity, Terrel must demonstrate that the defendant officers violated a clearly established right of Terrel's. I find that Terrel has not met his burden. Problematic to Terrel's argument is that his opposition fails to identify any case law demonstrating the officers' actions put the "constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). I nonetheless consider and apply Ninth Circuit law in resolving this motion. The evidence shows that, based on the circumstances of this case, Terrel was free to film Eila and Tierra's arrests. *See Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018) ("The First Amendment protects the right to photograph and record matters of public interest."). Terrel was also free to verbally challenge the officers. *See Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990) (discussing well established right of citizens to verbally challenge the police.). Thus, while Terrel's interaction with the police began with him freely exercising his rights, that interaction changed when he failed to follow their directives, multiple times, and then resisted arrest using physical force.

While Montgomery did use his bodyweight to subdue Terrel, the use of body weight was brief and only used because Terrel was robustly resisting the officers' actions. *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994) (the nature and degree of physical contact are relevant to a court's analysis). While Ninth Circuit precedent clearly prohibits the use of significant force against a cooperative or passively resisting suspect who is suspected of a minor crime and poses no apparent threat to officer safety, the same is not true when a suspect actively resists arrest. *See Lowry v. City of San Diego*, 858 F.3d 1248, 1258 (9th Cir. 2017). "Resistance . . . does not entitle police officers to use *any* amount of force to restrain a suspect," however, and a court must consider the particular facts of the case. *See LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) (citing *Barnard v. Theobald*, 721 F.3d 1069, 1076 (9th Cir. 2013)). Here, the video footage indicates that the officers had a taser available and ready, but repeatedly warned Terrel to stop resisting in an effort not to use it (and indeed did not use it), and then quickly stopped using force of any kind once Terrel was secured and compliant. Further, and while not dispositive,

Terrel fails to articulate what, if any, injuries he sustained from his arrest. The "risk of harm and the actual harm experienced," are also relevant to my consideration. *Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012).

Moreover, the facts of this case are distinguishable from cases where excessive force has been found. For example, in *Gravelet-Blondin v. Shelton*, the court found excessive force where a police officer tased a passively resistant plaintiff, who was under arrest for a minor crime and there was no reason to believe that the plaintiff posed an immediate threat to anyone's safety. 728 F.3d 1086, 1089 (9th Cir. 2013). Likewise, in *Young v. Cnty. of L.A.* the court found excessive force when the police used pepper spray and struck the plaintiff with a baton during a traffic stop. 655 F.3d 1156, 1168 (9th Cir. 2011). In yet another case, *Winterrowd v. Nelson*, the court found that officers used excessive force when they forced the plaintiff onto the hood of a car, cranked up an already injured right arm causing him to scream, and then applied even more force to his injured arm despite him screaming in pain. 480 F.3d 1181, 1184–85 (9th Cir. 2007).

Here, the evidence does not demonstrate a clear, established statutory or constitutional rights violation. While the court questions the necessity of arresting Terrel given that the officers had already secured Eila and Tierra and it appeared that the situation was de-escalating, for the reasons stated above, I find that the officers are entitled to qualified immunity for Terrel's Fourth Amendment claim for relief and therefore grant summary judgment in their favor.

   3.   *The plaintiffs' Fourteenth Amendment claim fails because the officers had probable cause.*

The plaintiffs also claim that the officer defendants violated their right to procedural due process under the Fourteenth Amendment. "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978). The plaintiffs argue that they have the right to be free from unlawful arrests without probable cause. ECF No. 37 at 18–19. But I have already determined that the officer defendants had probable cause to arrest both Eila and Terrel. *Infra* subsection *B(1)*. And probable cause for an arrest defeats any subsequent claim for

unlawful imprisonment under § 1983. *See Cabrera v. Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) (stating that plaintiff would "have to demonstrate that there was no probable cause to arrest him" to prevail on § 1983 claims). I thus grant the defendants summary judgment on the plaintiffs' Fourteenth Amendment claim.

A. *The plaintiffs' Fifth Amendment claim is wrongfully pled.*

The plaintiffs seem to have abandoned their claim for a Fifth Amendment due process violation. *See generally* ECF No. 37. They cannot successfully sue state governments or their employees under the Fifth Amendment. *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001). Thus, because they sue only state actors, I grant the defendants summary judgment on the plaintiffs' Fifth Amendment claim.

B. *The plaintiffs'* Monell *claim cannot be supported without an underlying constitutional violation.*

A local government may be sued under § 1983 only under certain circumstances. *Monell v. NYC Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To establish municipal liability, plaintiffs must plausibly allege that "(1) [they were] deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [their] constitutional right[s]; and (4) the policy was the moving force behind the constitutional violation[s]." *Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020). The policy can be an official policy, a "pervasive practice or custom," a failure to train or supervise, or an "act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019). Liability under a theory of respondeat superior is insufficient to confer § 1983 municipal liability. *Id.* at 603. Thus, municipal liability attaches only when execution of a government policy or custom inflicts a plaintiff's injury. *See Monell*, 436 U.S. at 694; *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403 (1997).

As the plaintiffs themselves note, a necessary condition to a *Monell* claim is that the plaintiff must demonstrate that he suffered a violation of his constitutional rights. *See Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1087 (9th Cir. 2000) ("To hold a [] department liable for

the actions of its officers, the [plaintiffs] must demonstrate a constitutional deprivation[.]"). But because plaintiffs have failed to successfully plead and/or support an actionable constitutional violation, I find no *Monell* violation. I thus grant the defendants summary judgment on the plaintiffs' *Monell* claim.

      *C.  I decline to exercise supplemental jurisdiction over the plaintiffs' pendent claims.*

      A district court has discretion "to decline to exercise supplemental jurisdiction over" an action if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). District courts may decline to exercise jurisdiction over supplemental state law claims "[d]epending on a host of factors" including "the circumstances of the particular case, the nature of the state[-]law claims, the character of the governing state law, and the relationship between the state and federal claims." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997). The supplemental jurisdiction statute "reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

      "[I]n the usual case in which federal[-]law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state[-]law claims." *Reynolds v. Cnty. of San Diego*, 84 F.3d 1162, 1171 (9th Cir. 1996); *see also De LaTorre v. CashCall, Inc.*, 2019 WL 452028, at *4 (N.D. Cal. Feb. 5, 2019) ("The elimination of federal claims does not automatically deprive district courts of subject[-]matter jurisdiction over any supplemental state[-]law claims. However, comity and precedent in this circuit strongly disfavor[] exercising supplemental jurisdiction.") (cleaned up).

      Because I grant summary judgment in favor of the defendants on all of the federal claims for relief, I find that the issues of economy, convenience, fairness, and comity weigh in favor of remanding the remaining claims to state court. The remaining claims are based on state law, and

the determination of state-law claims should generally be made in state court. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

## IV.   Conclusion

IT IS THEREFORE ORDERED that the plaintiffs' motion for partial summary judgment [ECF No. 28] is **DENIED AS MOOT.**

IT IS FURTHER ORDERED that the defendants' motion for summary judgment [ECF No. 29] is **GRANTED**. Cesena is entitled to summary judgment on all claims against him. The defendants are entitled to summary judgment on all of the federal claims, and I decline to exercise supplemental jurisdiction over the remaining state claims—those are remanded to state court.

The Clerk of Court is directed to enter judgment accordingly and to CLOSE THIS CASE.

Dated: September 15, 2023

_____
Cristina D. Silva
United States District Judge